# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## FORT WAYNE DIVISION

| | | |
|---|---|---|
| THOMAS D. NEEDHAM, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Cause No. 1:04 CV 393 |
| | ) | |
| INNERPAC, INC., | ) | |
| | ) | |
| Defendant | ) | |

## OPINION OF DECISION AND ORDER

Presently before the court are cross-motions for summary judgment filed by the parties on December 14 and December 15, 2005.[1]  Plaintiff also filed two motions to strike one seeking to strike, in its entirety,  an affidavit submitted by Defendants and the other seeking to strike portions of the affidavit after Defendants amended the original in response to the first motion to strike.  On May 19, 2006, after reviewing the above filings, the court held a telephonic conference wherein it ordered the parties to submit additional briefs.  The Defendant filed its brief on June19, 2006 to which the Plaintiff responded on July 19, 2006.  Defendant replied on August 3, 2006.  For the following reasons, the Plaintiff's motion for partial summary judgment will be DENIED.  The Defendant's Motion for Summary Judgment will be GRANTED as to the claims for conversion, actual fraud, and constructive fraud; GRANTED as to Needham's contention that Innerpac breached the contract by failing to pay him a bonus in 2003; and DENIED as to all other claims.  Both

---

[1]Plaintiff's motion seeks partial summary judgment on a portion of the breach of contract claim and on his statutory wage claim.  Defendant's motion seeks summary judgment on all claims.

1

motions to strike will be DENIED as MOOT.[2]

## FACTUAL BACKGROUND

Defendant Innerpac ("Innerpac") is a Delaware corporation that manufactures packaging material, including corrugated and chipboard partitions.  Its headquarters and principal place of business are located in Cicero, Illinois although it maintains other manufacturing facilities in Texas and New Hampshire.  The company markets its products throughout the lower 48 states through a nationwide sales force working from home offices.  Sales activity is generated through the use of wholesale buyers who, in turn, resell the product to end use customers at a retail price.

Prior to August 2000, Needham, an Indiana resident, applied for employment with Innerpac and was interviewed by representatives of Innerpac in Cicero, Illinois.On August 8, 2000, Needham received an initial proposal for employment ("Initial Proposal") from Gene Marino ("Marino"), Vice President of Sales and Marketing.  With respect to compensation, Item 3 of the Initial Proposal provided for a $55,000 salary for one year with an eventual transition to a draw-based commission program.  The last paragraph of Item 3 reads as follows:

> Under the draw-based program, you are eligible to receive advanced payment commensurate with your $55,000 salary against future commissions earned.  Excess commissions earned will be reconciled and paid to you in the month directly following when they are earned.

Item 4 further defines the term "commissions" as "net of freight on business based on the month of shipment" and indicates that commissions paid "will range from 3.5% to 10% based on profit margin."  Item 5 provides for the reimbursement for various business expenses incurred by Needham capped at $500.00 per month.

---

[2]The first motion to strike is mooted by the Defendant's filing of an Amended Affidavit of Eugene Marino which is intended to correct the deficiencies alleged in the motion to strike.

Upon receipt of this Initial Proposal, Needham sent correspondence to the attention of Marino wherein he sought clarification of various terms set out in the Initial Proposal.  One such item was whether "commissions earned and paid are to be based on current and future sales from territory."   In addition, Needham requested information regarding home office reimbursement expenses,  mileage reimbursement, and health insurance.

 Innerpac responded to these requests on August 11, 2000 by amending its August 8, 2000 Offer Letter ("Final Offer").  Item 5 in this Final Offer incorporated Needham's request for a provision discussing reimbursement of home office expenses.  Similarly, Innerpac added language to last paragraph of item 3 of the Initial Proposal.  This amendment read:  "Commissions are based on current monthly shipments according to a contribution margin and paid net of freight charges."

On August 15, 2000,  Needham accepted the Final Offer and entered into an employment agreement ("The Agreement") with Innerpac wherein Needham agreed to work as a company sales representative in exchange for payment from Innerpac as set forth in the Agreement.  Additional terms of employment were later incorporated, via signed memorandum dated August 28, 2000, a date coinciding with Needham's first official workday with Innerpac.

Needham's duties as an Innerpac sales representative included prospecting new customers and increasing sales to existing customers within an assigned geographical area including Indiana, parts of Ohio, Michigan and Kentucky.  Initially,  Needham was compensated under a defined salary plan under which he received an annual salary of $55,000 which was increased on January 31, 2000 to $65,000.

On April 1, 2001, Innerpac, pursuant to the Agreement, transitioned Needham to a straight commissions salary.  The Agreement provided that Needham be paid a commission calculated at a

rate between 3.5% and 10% of sales, net of freight charges, based upon "profit margin." In most months, Needham was paid commissions at a rate of 3.5%. However, from June 7, 2001 until June 30, 2002, Needham's commission rate on new business was temporarily increased to 10% after freight. Needham was paid commissions on all sales generated within his defined sales territory regardless of whether he personally solicited the order or had ever serviced the customer. Needham earned a right to commission only after a customer within his defined territory placed a purchase order with Innerpac and that order was shipped to the customer.

From April 2001 through July 15, 2003, Needham developed significant customer relationships with at least fifty-one (51) new or return customers located throughout his territory. These relationships yielded Innerpac a flow of sales orders and profitable revenue. Some of the companies had never transacted business with Innerpac prior to the efforts of Needham. In return, Innerpac paid Needham commissions on the new accounts and reopened accounts as well as both initial orders and reorders. Likewise, if a customer which Needham had developed subsequently expanded its order to include new or additional products, Needham received commissions on these sales. Thus, the sales credit Needham received and the corresponding payment of commissions was based upon Needham's procurement of the vendor relationship and all sales from that relationship.

During his tenure with Innerpac, Needham believed on several occasions that his commissions calculations were erroneous and he brought the errors to Innerpac's attention. According to Needham, many of the errors were corrected but others were not and he was discouraged by Marino from pointing out future errors. Needham has submitted an affidavit from Julie Mavrogeanes ("Mavrogeanes"), an Innerpac employee in the customer service department, wherein she avers that during the course of performing her duties at Innerpac she observed that

4

freight charges were being purposely overinflated so as to reduce the amount of commissions payable to sales representatives, including Needham.  (Docket Entry 33, Exh.3).  In particular, Mavrogeanes avers that at least forty percent of transactions involving Needham's sales reflected freight shipping charges which were obviously in excess of the actual cost of shipping.  (*Id.* at ¶4). According to her affidavit, Mavrogeanes reported her observations to her supervisor, Pat Dombeck ("Dombeck"), but the inflated charges continued to appear on reports of sales attributable to Needham.[3]

In January 2003, Innerpac issued a memorandum to sales representatives explaining bonus calculations under its 2003 annual incentive plan ("the Bonus Plan").  At or around the same time Innerpac established a sales performance plan for Needham for the 2003 sales year.  Under the Bonus Plan, sales representatives were to receive a 12% payout on annual commissions earned upon exceeding their annual sales goal.  Sales representatives also were to receive an additional 10% on annual commissions earned if, in addition to exceeding their annual sales goal, Innerpac determined that the corporation as a whole exceeded its plan and that the sales representative achieved superior performance above their individual plan.

On February 4, 2003, Innerpac required Needham to submit to a comprehensive evaluation conducted in Indianapolis, Indiana.  According to Needham, the result of the evaluation reflected favorably upon him.  Further, he notes that during 2002, Innerpac assigned Needham's sales quota of $2,106,152.63 and that his actual performance result was 38% over this amount.  Needham,

---

[3] Innerpac disputes that Needham was discouraged from notifying it of commission disputes and likewise, submits an affidavit from Marino wherein he avers that Mavrogeanes was not in a position with Innerpac where she would have knowledge about the matters contained in her affidavit and specifically, that she "did not have authority or access to information necessary to calculate final freight charges." (Marino Supp. Aff. ¶10).

therefore, was Innerpac's top sales representative as measured by percentage over budget.

According to Innerpac, however, Needham performed below the 2003 sales performance plan for each month he worked in 2003. By July 2003, Needham's annual sales were 26.9% below his sales goal. As a result, on July 8, 2003, Innerpac, citing poor sales performance, notified Needham of his termination effective July 15, 2003. Innerpac compensated Needham for all sales he secured prior to his termination effective date but did not pay him a bonus for 2003 nor has it paid him commissions for sales closed after his termination.

Shortly after Needham left Innerpac's employ, Innerpac placed another sales representative in Needham's territory. This sales representative has continued to procure the business from Needham's former customers. Innerpac has paid commissions to this sales representative for all sales placed within his respective sales territory since he began his employment with Innerpac regardless of whether he personally solicited the orders or whether the customer had a prior relationship with Needham.

**JIT PACKAGING**

In June 2003, Needham made an initial sales call to JIT Packaging ("JIT") in Lebanon, Ohio to establish a business relationship between JIT and Innerpac. Needham met with an individual in the traffic department who referred him to JIT's operation manager, Teniel Carter ("Carter") who was unavailable to meet with him on that day. Subsequently, however, Needham met three times with Carter. On June 26, 2003, Needham requested four quotes from Innerpac related to JIT. The following day Innerpac prepared and mailed the quotes to JIT. Thereafter, Needham communicated with Carter via telephone but did not make any in-person sales calls to JIT prior to his termination. JIT placed no orders with Innerpac during the time Needham was employed by it.

6

However, JIT and Innerpac continued negotiations after Needham's termination and, in October 2003, JIT made its first purchase of products from Innerpac. Needham contends he is owed commissions for JIT's purchases because he established the relationship with that customer prior to his termination.

## DISCUSSION

Based upon the aforementioned facts, Needham filed his Complaint asserting state law claims for unpaid wages, commission, and bonuses under the Illinois Sales Representatives Act (Count 1), breach of contract (Count 2), conversion (Count 3), and actual and constructive fraud (Count 4). He also seeks an accounting in count 5.

The thrust of Needham's complaint is that Innerpac has not paid him all of the commissions due and owing to him. He contends, for instance, that their Agreement required Innerpac to continue paying him commission post-termination on future sales that he procured through his efforts while employed with Innerpac. Second, Needham argues that he was not paid all of the commissions to which he was entitled during his employment with Innerpac because the commission calculations were erroneous and certain aspects, namely freight charges, were inflated by Innerpac to avoid paying additional sums to its sales representatives as commission. Third, Needham believes he is entitled to commissions from sales made by Innerpac to JIT after his termination because he initiated the contact with that customer. Given these arguments, Needham seeks partial summary judgment on Counts 1 and 2 of his Complaint which encompass his claims for breach of contract and unpaid commissions.

In response, Innerpac has moved for summary judgment on all claims alleging that: (1) Needham's claim for unpaid wages, commission, and bonuses is barred under Indiana law or

alternatively does not fall within the Illinois Sales Representative Act ("the Sales Act"); (2) Innerpac did not breach the contract with Needham because: (a) Needham is not entitled to any commissions for sales placed after his termination, (b) Innerpac paid Needham (and properly calculated) all commissions due him through July 15,2003, and (c) Needham is not entitled to any commissions for the sales made to JIT since those sales occurred after his termination; (3) Innerpac cannot be held liable for conversion where, as here, the underlying dispute relates to breach of contract; and (4) Needham cannot prove the elements of either constructive or actual fraud independent of the allegation of breach of contract..

In a diversity case we apply federal procedural law and state substantive law. *Dawn Equipment Co. v. Micro-Trak Systems, Inc.*, 186 F.3d 981, 986-87 (7th Cir.1999) ( *citing Erie R.R. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938)). Initially, the parties' briefs raised some question as to the applicable law in this case and gave the court some pause as to whether, as alleged by plaintiff, the court could apply Indiana law to the common law claims (Counts 2-5) and Illinois law (utilizing the same set of applicable facts) to the statutory claim (Count 1). The court held a telephonic conference wherein the issue was discussed and the court ordered supplemental briefs to be filed. Upon review of those briefs, the court concludes that because Count 1 alleges a claim under an Illinois statute, Illinois law clearly applies to determine whether the statute applies to the facts alleged to support the claim. *See Allen v. Great American Reserve Insurance Co.*, 766 N.E.2d 1157 (Ind. 2002) ("[T]he question is not which state's law applies to [the statutory] claims. There is no doubt that Indiana law applies to a claim under an Indiana statute. Rather the issue is whether the statutes apply to the facts alleged to support these claims, given that the allegations are based in significant part on acts that occurred outside of Indiana."). As to the common law claims,

the parties are in agreement that either Indiana or Illinois law applies and the result is the same in their view under either state's law. Thus, where possible, the court shall defer to Indiana law as the law of the forum where the suit was filed, with some reference to Illinois law where necessary.

**<u>Count 1: Claim for Unpaid Wages, Commissions, and Bonuses</u>**[4]

Count 1 of the Complaint alleges a statutory claim for unpaid wages, commissions and bonuses pursuant to the Illinois Sales Representative Act which provides in relevant part, that "[a]ll commissions due at the time of termination of a contract between a sales representative and principal shall be paid within 13 days of termination, and commissions that become due after termination shall be paid within 13 days of the date on which such commissions become due." 820 ILCS 120/2. Furthermore, a principal that fails to comply with this section "shall be liable in a civil action for exemplary damages ... Additionally, such principal shall pay the sales representative's reasonable attorney's fees and court costs." 820 ILCS 120/3.

In its motion, Innerpac asserts that it is entitled to summary judgment because the facts of

---

[4]The Complaint does not reference a specific statutory basis for this claim but, as defendant points out in its brief, the claim could fall squarely within the confines of Indiana's Wage Claim Statute, Ind..Code §22-2-9-1, *et seq.* which applies to claims for unpaid wages, bonuses, and commissions filed by "employees who have been separated from work by their employer" or the Illinois Sales Representative Act, 820 ILCS 12 0/1 *et seq.* ("the Sales Act") which provides a cause of action under Illinois law for "[a]ll commissions due at the time of termination of a contract between a sales representative and principal ..., and commissions that become due after termination." 820 ILCS 120/2. Innerpac argues that the absence of a specific statutory citation in the Complaint means that Needham waived his present claim under the Sales Act and, because Indiana law applies to the other claims in this suit under choice of law principles, plaintiff must be asserting a claim under Indiana's statutory provisions. This is a slightly confusing argument since elsewhere Innerpac concedes that either Illinois or Indiana law would be appropriate to the case. Nevertheless, Innerpac alternatively contends that it is entitled to summary judgment on this claim because even if the claim was brought under the Sales Act, the facts of this case preclude recovery under it.

During the telephone conference held after the initial briefs were filed in this case, Innerpac appeared to have abandoned its contention that Needham has waived his claim under the Sales Act. Moreover, all parties appear to agree that Innerpac would be entitled to summary judgment under the Indiana Wage Act if such a claim were, in fact, made here.

this case do not permit a cause of action under the Sales Act.  Specifically, Innerpac contends that the Sales Act only applies to a sales representative who is not considered an employee of an Illinois employer under the  Illinois Wage Payment and Collection Act ("the Wage Act"), 820 ILCS 120/1.  According to Innerpac, Needham falls within the protection of the Wage Act and not the Sales Act because Needham solicited orders from at least one Innerpac customer in Illinois thereby making him an "employee" under the Illinois Wage Act.

Innerpac is correct in its assertion that the Sales Act excludes by cross-reference persons falling under the umbrella of the Wage Act:

> "Sales representative" means a person who contracts with a principal to solicit orders and who is compensated, in whole or in part, by commission, *but shall not include one who qualifies as an employee of the principal pursuant to the Illinois Wage Payment and Collection Act* .

820 ILCS 120/1(4)(emphasis added). In turn, the  Wage Act defines the term "employee" as "any individual permitted to work by an employer in an occupation," subject to some exclusions inapplicable to the present case.[5]  The Wage Act is intended to "protect[] nonresidents of Illinois who perform work in [Illinois] for an Illinois employer" and thus, "nonresidents of Illinois who work in that state for an in-state employer may qualify as employees within the protection of the Wage Act." *Adams v. Carambone,* 359 F.3d 858, 863 (7th Cir. 2004).

Innerpac does not dispute that, at least, on its face, Needham, as a commissioned salesperson, meets the definition of "sales representative" under the Sales Act.  Nevertheless, Innerpac alleges that Needham is disqualified from the "sales representative" classification and must be classified

---

[5]The Illinois Wage Act excludes from the definition of "employee" a person (1) who is free from control over the performance of the work, (2) who performs work that is either outside the usual course of business or is performed outside all of the employer's places of business unless the employer is in the business of contracting with third parties for the placement of employees and (3) who is in an independently established trade, occupation, profession or business.  820 ILCS 115/1.

as an "employee" under the Wage Act due to activities he performed inside Illinois borders .

Innerpac points to paragraph 5 of a supplemental affidavit by Marino (which is subject to a pending

motion to strike filed by Needham) wherein Marino asserts that Needham performed work for

Innerpac in Illinois by soliciting sales from Schwarz Paper Company, an Illinois corporation with

facilities located in Morton Grove, Illinois and LaPorte, Indiana.[6]  (Marino Supp. Aff. ¶5).

In response, Needham filed a counter-affidavit wherein he admits making sales to Schwarz

Paper but states that all of his sales activities with regard to Schwarz Paper occurred at the

company's LaPorte, Indiana facility and all products marketed through Needham's efforts were

shipped to the Schwarz Paper Company's Indiana location.  Needham further contends that at no

time did he communicate with Schwarz representatives in Illinois nor was he involved in the billing

process with respect to the sales by Innerpac to the Indiana facility.  Finally,  Needham argues that

the fact that Schwarz has a facility in Illinois is irrelevant since all of Needham's sales were

consummated at the Indiana facility.

Whether Needham is covered by the Sales Act is a question of statutory construction. As the

Illinois Supreme Court held in *Solich v. George and Anna Portes Cancer Prevention Center,* 630

N.E.2d 820 (Ill.1994), "the cardinal rule of statutory construction, to which all other canons are

subordinate, is to ascertain and give effect to the true intent and meaning of the legislature." The best

indication of legislative intent is the statutory language. *Id.*

Innerpac has not asserted in its brief how it is that the solicitation of orders  from a company

---

[6]The motion to strike involves the issue of whether the facts asserted in Marino's supplemental
affidavit constitute admissible evidence given that the information was acquired during mediation.  The
Court concludes that the motion to strike is MOOT since  even if the court denied the motion to strike, the
evidence does not aid the defendant in precluding Needham from seeking recovery under the Illinois
Sales Act.

with a dual presence in Indiana and  Illinois in exchange for commission on those sales transforms

Needham from a sales representative into an "employee" under the applicable statutes.   Instead,

Innerpac has simply relied upon the fact that Schwarz Paper has an Illinois office to establish its

contention that Needham is an employee.  Having reviewed the applicable statutes, this court is

unconvinced by the argument for several reasons.

 The Illinois General Assembly enacted the Sales Act to protect sales representatives, i.e.,

"person[s] who contract[] with a principal to solicit orders and who is compensated, in whole or in

part, by commission."  "[T]he Sales Act constitutes the legislature's pronouncement that protecting

sales representatives is fundamental public policy in Illinois." *Maher & Associates, Inc. v. Quality

Cabinets,* 640 N.E.2d 1000 (Ill. App. 1994)( citing *Midwest Enterprises, Inc. v. Generac Corp.,* 1991

WL 169059 (N.D.Ill.1991).

The facts here are clear and undisputed:  Needham and Innerpac contracted with each other

for Needham to solicit orders within his exclusive territory and for his compensation to be (after an

initial salary period) entirely based upon commission.[7]  Moreover, even if Needham could be said

to have solicited orders in Illinois, the plain language of the Sales Act  does not limit the location

for the solicitation of orders so as to exclude from its coverage persons who solicit orders within and

without the Illinois border.   Since the ultimate goal of the Sales Act is to ensure that sales

representatives receive the compensation they are due by Illinois based companies, it makes little

---

[7]Innerpac has not asserted that it is not a "principal" within the meaning of the Sales Act.  A
"principal" under the Sales Act means "a sole proprietorship, partnership, corporation or other business
entity whether or not it has a permanent or fixed place of business in this State and which:
(A) Manufactures, produces, imports, or distributes a product for sale; (B) Contracts with a sales
representative to solicit orders for the product; and (C) Compensates the sales representative, in whole or
in part, by commission."  820 ILCS § 120/3.

sense that the Illinois legislature would intend to limit recovery under the Sales Act to nonresident persons soliciting orders outside Illinois borders and not protect sales representatives who procured orders from Illinois residents.[8]

In fact, the Illinois legislature has expanded the coverage of the Sales Act in recent years. In 1990, for instance, the Illinois General Assembly expanded the scope of the Sales Act by removing a restriction in the definition of "sales representative" which limited the Act to sales representatives soliciting orders within Illinois.  By removing that restriction, the General Assembly opened up the statute to salespersons soliciting orders outside the Illinois border as well as those sales representatives soliciting orders within its borders.  *See Circuit Systems, Inc. v. Mescalero Sales, Inc.* 925 F.Supp. 546, 549 (N.D.Ill.,1996) ("The court finds legislative intent to extend ISRA to all sales representation agreements having a constitutional connection to the State of Illinois such that jurisdiction would lie.").  Given that the plain language of the statute does not foreclose Needham's claim and the fact that the Illinois legislature has expressed a broad public policy in favor of protecting sales representatives,  this court concludes as a matter of law, that the  Sales Act is applicable to Needham's statutory claim for commissions.

This said, whether Needham can ultimately prevail under the statutory claim is not suitable for resolution on summary judgment for at least two reasons.  First, none of the parties have asked the court to resolve the issue at summary judgment and, more importantly, the issue of whether Needham is contractually entitled to certain commissions is not resolvable at the summary judgment

---

[8]It is also clear that the Illinois legislature intended the Sales Act to create sound public policy protecting sales representatives since section 2 of the Sales Act provides that "[a]ny provision in any contract between a sales representative and principal purporting to waive any of the provisions of this Act shall be void" 820 ILCS 120/2.

stage for the reasons set out in the analysis of the breach of contract claim.

## Count 2 – Breach of Contract Claim

In addition to his claim under the Sales Act Needham asserts a common law breach of contract claim asserting that Innerpac breached the Agreement by (1) refusing to pay post-termination commissions for orders placed by Innerpac customers previously serviced by Needham; (2) failing to properly calculate his commissions on prior sales and intentionally miscalculating commissions; and (3) failing to pay him an annual bonus in the year of his termination.  In their filings, both parties assert that they are entitled to summary judgment on this claim.  Each alleged breach shall be addressed in turn below.

### (1) Post-Termination Commissions

Needham contends he is entitled to commissions for all orders placed by his customers after his termination because he was the "procuring cause" of those orders.  According to Innerpac, however, the Agreement between the parties expressly precludes recovery for post-termination commissions thereby making the "procuring cause rule" inapposite to Needham's claim and thus, summary judgment is appropriate in its favor.

Under the procuring cause rule, a party may be entitled to commissions on sales made after the termination of a contract if that party procured the sales through his activities prior to termination. The rule applies, however, only if the contract does not expressly provide when commissions will be paid.  *Technical Representatives, Inc., v. Richardson Merrell, Inc.*, 438 N.E.2d 599 (Ill. App. 1982); *Harold Wright Co., Inc. v. E.I. DuPont De Nemours & Co., Inc*. 49 F.3d 308, 309 (7th Cir.1995) (applying Indiana law). This rule protects a salesman who is discharged prior to culmination of a sale but who has done everything necessary to effect the sale. *Heuvelman v. Triplett*

14

*Electrical Instrument Co.,* 161 N.E.2d 875 (Ill. App. 1959).  The doctrine is that, in the absence of a contrary agreement, an agent is entitled to be compensated by his principal for a deal of which the agent is the "procuring cause," even if he has been cut out of the deal by termination or otherwise. *Harold Wright,* 49 F.3d at 309*; Milwaukee Auction Galleries, Ltd. v. Chalk,* 13 F.3d 1107, 1110 (7th Cir.1994).

The Agreement between Needham and Innerpac provides as follows: "Commissions are based on current monthly shipments according to a contribution margin schedule and paid net of freight charges."  Innerpac contends that this language is unambiguous, that it clearly limits Needham's commissions to "current" sales, those that occurred while he was employed at Innerpac. Needham, however, contends that all the above language states is that he is entitled to commissions for the current shipments each month from his customers; it does not, he argues, say that the right to commission ends upon his termination.

Under both Indiana and Illinois law, the construction of an unambiguous contract is a question of law for the court to decide. *The Beanstalk Group, Inc. v. AM Gen. Corp.,* 143 F.Supp.2d 1020, 1026 (N.D.Ind.2001). However, "[i]f reasonable men would find the contract susceptible of more than one construction, ambiguity exists making summary judgment inappropriate, it being the responsibility of the trier of fact to ascertain the extrinsic facts necessary to interpret the contract." *Ancich v. Mobil Oil Corp.,* 422 N.E.2d 1320, 1321-22 (Ind.Ct.App.1981). "Where a contract is ambiguous ··· and its meaning cannot be gleaned from the four corners of the instrument, the intention of the parties is a question of fact and resort to extrinsic evidence is proper." *Anderson v. Horizon Homes, Inc.,* 644 N.E.2d 1281, 1290 (Ind.Ct.App.1995).

In this case, this court cannot conclude that the contract unambiguously or expressly[9] precludes the payment of post-termination commissions to Needham. What the language in the Agreement does say is  how commissions are calculated (i.e. according to a contribution margin schedule and paid net of freight charges) and on what basis commissions are paid (i.e. for "current monthly shipments" of products).[10]  What is omitted from the language of the contract is any language expressly indicating that Needham is not entitled to commissions for "existing monthly shipments occurring post-termination."  It is this key fact that is the crux of this case and  both parties provide persuasive rationales as well as extrinsic evidence as to what they intended or understood the Agreement's language to mean at that time they entered into the contract.[11] However, since the question of what each party to the contract intended must be considered in context with the events leading to the contract's formation as well as the relationship of the parties during their transactional history; they raise issues of triable, material fact and are not amenable to summary judgment disposition.

Moreover, even if Needham prevails at  trial on the issue of whether the contract covers future commissions (i.e., a jury concludes that the contract does not exclude him from receiving post-termination commissions), he must still ultimately overcome the hurdle of proving  that he was

---

[9]To the extent Innerpac argues that the Agreement expressly limits the payment of commissions to those earned while Needham was employed.  This is simply incorrect.  The plain meaning of "Expressly" is explicitly or specifically.  The Agreement does not specifically state that "commissions are limited to those earned during the term of employment" or anything similar to that.

[10]The dictionary meaning of "current" is "occurring in or existing at the present time." As applied here, the contract provides that Needham is entitled to commissions for "existing monthly shipments."

[11]One of the arguments made by Innerpac is that industry custom precludes application of the procuring cause rule to Needham.  Evidence of industry custom may, in fact, be relevant to aid the factfinder in determining the intent of the parties.

16

the procuring cause of the future orders (i.e., but for his efforts while he was employed, the orders would not have been placed). Innerpac urges that it is entitled to summary judgment on this issue as well because Needham cannot demonstrate that he was, in fact, a procuring cause for various sales or that he did "everything that is necessary to effect the sale," *Furth v. Inc. Publ'g Corp.,* 823 F.2d 1178, 1180 (7th Cir.1987), but was terminated before it was consummated.

On the whole, Needham broadly argues that he was the procuring cause of post-termination orders because he secured and serviced at least 51 accounts while employed by Innerpac and that his primary goal was to target a customer demographic which would provide continuing streams of orders and reorders over a number of years. He argues, therefore, that his efforts to secure these customer accounts and service them while he was employed by Innerpac were designed to create return business (i.e., future orders). Needham also asserts that he was the procuring cause of orders placed by JIT since he initiated negotiations with management of JIT prior to his termination and provided price quotes to JIT for orders that they later placed.

Innerpac is equally broad in its assertion that Needham did not procure any of the post-termination sales for which he now seeks commissions, including JIT's orders, relying simply on saying that another salesperson was in place at the time the orders were placed and that considerable effort by others occurred before JIT placed its orders with Innerpac. There is nothing in the record from Innerpac demonstrating what, in fact, the new salesperson did or did not do with respect to sales orders placed by Needham's former customers so as to show that Needham's replacement procured the orders rather than Needham.

Neither party's submissions identify the number of orders at issue, from which customers they originate, the date the orders were placed, or what actions Needham took prior to his

17

termination to secure the orders from the customers. At best, the court has only Needham's blanket assertion that he had developed a longstanding relationship with his customer base and thus, his efforts led to the continued business given to Innerpac. Likewise, the court has only Innerpac's blanket assertion that this longstanding relationship did not give rise to the additional orders it received from Needham's former customers. Whether these broad assertions and denials by the parties are sufficient to raise a genuine issue of material fact on the issue of whether Needham is entitled to post-termination commissions is questionable. In *Furth v. INC. Publishing Corporation*, 823 F.2d 1178 (7th Cir. 1987), cited by Innerpac in its brief, an advertising sales representative brought suit claiming that he was entitled to commissions for advertisements placed after his termination by the Defendant. The case proceeded to trial and at the close of evidence the district judge found that Furth introduced insufficient evidence to support his claim that he was the procuring cause of the disputed advertisements. The Seventh Circuit affirmed, writing:

> In the main, Mr Furth has been content to paint with a very broad brush. [Furth asserts that,] 'These are customers that I developed and I must have been the procuring cause in order for them to have inserted space or advertising in INC. magazine.' The court also noted that although Furth argued that he was entitled to commissions because he had procured the insertion orders, the evidence showed he was not entitled to a commission until the advertisement was actually run. Furth had not done everything necessary to effect the sale, because the advertisements could have been withdrawn...[W]e agree with the district court that, on these facts, Furth has failed to prove that he was the procuring cause of the advertisements in dispute.

*Id*. at 1180-1181.

In another case, *Hammond Group, Ltd. v. Spalding & Evenflo Companies, Inc.,* 69 F.3d 845, 850 (7th Cir. 1995), the Seventh Circuit reiterated the rationale in *Furth* as follows:

> In *Furth v. Incorporated Publishing Corporation,* 823 F.2d 1178 (7th Cir.1987), we required that to recover under the procuring cause doctrine, a plaintiff must sufficiently identify all sales for which it claims credit. *Furth,* 823 F.2d at 1181; see also *Dahly [Tool Co. v. Vermont Tap and Die Co.],* 742 F.2d [311], 314 [(7th

18

Cir.1984)]("Because the appellant did not allege any order which he actually procured, he is not entitled to commissions based on an extra-contractual remedy like the procuring cause doctrine."). Hammond introduced into evidence numerous invoices demonstrating sales by Spalding personnel, but did not offer any evidence tying specific invoices to efforts made by Hammond. Thus, Hammond failed to prove its procurement performance.

This Court's recent opinion in *Harold Wright Co. v. E.I. DuPont De Nemours & Co.,* 49 F.3d 308 (7th Cir.1995), is not inconsistent with our holding. In *Wright,* this Court reversed a summary judgment in favor of the defendant as being premature, and remanded the case to see if the procuring cause doctrine applied. In addition, this Court stated that Wright might be permitted to recover commissions on orders shipped after the end of its contract if it could prove custom or specific negotiating history of the parties. *Id.* at 310. No such proof has been adduced by Hammond.

*Id.* Having reviewed the aformentioned authorities in their entirety, the court finds the reasoning therein persuasive in that once the evidence has been presented at trial, it may very well be that Needham cannot prove that he was the procuring cause of any of the orders that are in dispute. Unlike where the court stands in this case presently, however, both *Furth* and *Hammond* were decided pursuant to directed verdict motions pursuant to Fed.R.Civ.P. 41 after the close of the plaintiff's trial evidence. At this stage, however, resolving all reasonable inferences gleaned from the facts in Needham's favor, the court shall permit the trier of fact to sort out the evidence should it be faced with the issue at trial.

### (2) **Needham's Commissions while Employed by Innerpac**

Needham also seeks to recover for commissions due him during his employment with Innerpac. Needham asserts that the evidence submitted demonstrates that Innerpac overinflated the freight charges so as to reduce the amount of commission payable to him and thus, Innerpac owes him the commissions he would have received had the freight charges been accurate. Innerpac, however, contends that it properly calculated Needham's commissions so as to comply with the terms of their Agreement.

19

As noted elsewhere, the Agreement provides for payment of commissions "on current monthly shipments according to a contribution margin schedule and paid net of freight charges." Paragraph 4 further defines commission:

> Commissions are net of freight on business based on the month of shipment. Commissions paid will range from 3.5% to 10% based on profit margin.

The Agreement does not expressly define the terms "profit margin" or "freight" but Innerpac argues that "internal company policies determine profit margins and freight charges."

Innerpac contends that it has paid Needham all that it owes him under the Agreement and that once he accepted the Agreement, Needham agreed to the terms therein. Innerpac further asserts that by accepting his monthly commission checks he reaffirmed his understanding of the terms in the Agreement. This court finds Innerpac's argument unavailing.

While it is true that Needham agreed to the terms of the Agreement, those terms do not specify the meaning of the term "freight" or "profit margin." Upon reviewing the provisions of a written contract, the goal is to determine the intent of the parties at the time of execution as revealed by the language they chose in expressing their rights and responsibilities. *Jacobs v. Hilliard,* 829 N.E.2d 629, 632 (Ind.Ct.App.2005), *trans. denied.* If the contract language is clear and unambiguous, we will give the language its plain and ordinary meaning. *Fairway Developers, Inc. v. Marcum,* 832 N.E.2d 581, 584 (Ind.Ct.App.2005).

Here, the plain meaning of the term "freight" is "the compensation paid for the transportation of goods." *See* Merriam Webster Online Dictionary. Thus, under the Agreement, "commissions" are payable "net of" the compensation paid [by Innerpac] for transporting the goods. As for the term "profit margin," the common meaning is generally noted as "the difference which exists between

20

net sales and the cost of merchandise sold and from which expenses are usually met or profit derived" or "earnings expressed as a percentage of revenue, i.e., the percentage of sales the company has left over as profit after paying all expenses." Thus, pursuant to the agreement, Needham was entitled to commissions ranging from 3.5% to 10% based on the profit Innerpac had after paying expenses, including freight.

Even having concluded that the above terms are entitled to their ordinary meaning, this court finds ambiguity in the application of the Agreement's terms to Needham. Needham has submitted admissible evidence which raises a genuine dispute of fact as to whether Innerpac overinflated the freight charges on his orders and thereby yielding less in commissions (and presumably profit margin) under the Agreement than he believes he otherwise would have received if the freight charges were accurate.[12] Innerpac, however, contends that the freight charges and profit margins are determined by internal company policies. This said, it is up to the factfinder to determine whether Innerpac breached the Agreement in the manner in which it chose to pay commissions under the plain meaning of the terms in the Agreement. The Agreement entitles Needham to commissions net of freight and a range of commissions based upon a certain profit margin. A genuine issue of material fact exists as to whether Innerpac breached the Agreement by its failure to pay Needham what he was due under his employment contract.[13] Given the disputes in the evidence, both parties motions for summary judgment on this claim are DENIED.

---

[12]Of course, Innerpac submits that the evidence is not credible because Mavrogeanes was not in a position to observe or have access to information relating to final freight charges. However, whether Mavrogeanes' testimony is credible is a question for the trier of fact, not this court at the summary judgment stage.

[13]Again, the court notes that Needham may have an uphill battle in this regard as his damages at this point are speculative. The court presumes that Needham will provide specific evidence of freight charges he asserts were overinflated to establish, with certainty, his damages.

### (3) **Bonus for 2003**

Needham further contends that he is entitled to an annual bonus for 2003, the year in which he was terminated.  Again, Needham contends that the Agreement is ambiguous as to the payment of the bonus and thus, he is entitled to have a jury determine whether one should have been paid.  The court shall not expend much effort on this contention since plaintiff himself only addressed the argument in a single conclusory sentence in his brief.  (Docket #33, p. 10 "The promise of a 12% annual bonus is similarly ambiguous, and represents a proper consideration for the jury.").  The court will not scour a record to locate evidence supporting a party's legal argument. *See Peters v. Renaissance Hotel Operating Co.,* 307 F.3d 535, 547 n. 10 (7th Cir.2002). Indeed, perfunctory or undeveloped arguments are waived. *Colburn v. Trustees of Ind. Univ.,* 973 F.2d 581, 593 (7th Cir.1992); *Hunter v. Allis-Chalmers Corp.,* 797 F.2d 1417 (7th Cir.1986).  Needham does not present any argument as to why he is entitled to a bonus, especially given his termination mid-year for falling below certain sales goals.  Accordingly, Innerpac's Motion for Summary Judgment is GRANTED as to this portion of the breach of contract claim.

### Count III – Conversion[14]

Needham also claims that Innerpac converted funds otherwise owed to him in violation of Indiana law.  Under Ind.Code § 34-24-3-1, a person who proves the elements of criminal conversion by a preponderance of the evidence can recover up to three times the actual damages, the costs of the action, and reasonable attorney's fees. *Whitaker v. Brunner,* 814 N.E.2d 288, 297 (Ind.Ct.App.2004), *Jamrosz v. Resource Benefits, Inc*. 839 N.E.2d 746, *758 (Ind.App.,2005).  A

---

[14]Needham's Motion for Partial Summary Judgment did not include this claim or the fraud claims.

person commits criminal conversion when he "knowingly or intentionally exerts unauthorized control over property of another person." Ind.Code § 35-43-4-3. However, the statute does not apply to the failure to pay a debt or to routine contract disputes. *Excel Indus., Inc. v. Signal Capital Corp.,* 574 N.E.2d 946, 948 (Ind.Ct.App.1991). Indeed, case law is clear that "the legislature did not intend to criminalize bona fide contract disputes." *Greco v. KMA Auto Exch., Inc.,* 765 N.E.2d at 147 (quoting *NationsCredit Commercial Corp. v. Grauel Enter., Inc.,* 703 N.E.2d 1072, 1078 (Ind.Ct.App.1998), *trans. denied* ).

Given the above case law, Innerpac argues that Needham's evidence is insufficient to prove the mens rea required for conversion and that conversion requires more than a mere breach of contract. Needham, of course, relies upon the affidavit of Mavrogeanes to show that Innerpac officials intentionally overinflated the freight costs and thus, this was not a case of an innocent or mistaken breach of contract. Needham apparently relies on the fact that Mavrogeanes reported her suspicions of inflated freight costs to her supervisor but the inflation of charges continued to support his contention.

The problem with Needham's assertion at this point is that while there is, in fact, evidence to support his contention that the freight charges were overinflated, there is nothing that suggests that they were intentionally overinflated. The court does not have before it any sworn testimony indicating that anyone at Innerpac was purposefully inflating the freight charges so as to "cheat" Needham of his commissions.

"The mens rea requirement 'differentiates criminal conversion from the more innocent breach of contract or failure to pay a debt situation that the criminal conversion statute was not intended to cover.'" *Whitaker,* 814 N.E.2d at 297 (quoting *Greco v. KMA Auto Exch., Inc.,* 765

N.E.2d 140, 147 (Ind.Ct.App.2002), and *Gilliana,* 708 N.E.2d at 899).  The gravamen of the present action is contract construction and, because the court has no evidence that Innerpac intentionally inflated freight charges so as to establish the *mens rea* element of criminal conversion, Innerpac's motion for summary judgment on this claim is GRANTED.

## Count IV – Actual and Constructive Fraud

### (a) Actual Fraud

Actual fraud exists when all of the following elements are fulfilled: (1) a material misrepresentation of past or existing facts; (2) made with knowledge or reckless ignorance of falsity; (3) causing the claimant to rely upon the misrepresentation to the claimant's detriment. *Abbott v. Bates,* 670 N.E.2d 916, 923 n. 4 (Ind.Ct.App.1996).  A claimant who brings both a breach of contract and a fraud claim must prove that (1) the breaching party committed the separate and independent tort of fraud; and (2) the fraud resulted in injury distinct from that resulting from the breach. *Id.; Epperly v. Johnson,* 734 N.E.2d 1066, 1073 (Ind.Ct.App.2000). While "[b]reaches of contract will almost invariably be regarded by the complaining party as oppressive, if not outright fraudulent," the claimant must nonetheless prove the independent tort. *Epperly,* 734 N.E.2d at 1073.

In this case, there is no evidence presented by Needham suggesting an independent tort of fraud.  The actions complained of in his briefs each relate to Innerpac's interpretation of the contract. For instance, Needham looks to commission reports generated by Innerpac and contends that those reports materially misrepresented his commission calculations thereby inducing him to accept less commission than he was otherwise due.  However, the harm asserted in the fraud claim is no different than his contention in his contract claim and thus, he has not set forth a genuine issue of material fact to support an independent tort of actual fraud..

**(b) Constructive Fraud**

Finally, Needham sets out a claim of constructive fraud. "Constructive fraud arises by operation of law from a course of conduct, which, if sanctioned by law, would secure an unconscionable advantage, irrespective of the actual intent to defraud." *Drudge v. Brandt,* 698 N.E.2d 1245, 1250 (Ind.Ct.App.1998); *Beaton & Associates, Ltd. v. Joslyn Mfg. & Supply Co.*, 512 N.E.2d 1286, 1291 (Ill.1987) (Constructive fraud "is a breach of a legal or equitable duty that the law declares fraudulent because of its tendency to deceive others, irrespective of the moral guilt of the wrongdoer." ). An essential element of the claim is "a breach of duty, especially fiduciary duty." *Kohler v. Leslie Hindman, Inc.,* 80 F.3d 1181, 1188 (7th Cir.1996); *Strong v. Jackson,* 777 N.E.2d 1141, 1147 (Ind.App.2002) ("The duty mentioned ... may arise... by virtue of the existence of a fiduciary relationship"). Such a breach can be shown where there is great inequality between the parties. See *In re Estate of Neprozatis,* 378 N.E.2d 1345, 1349-50 (Ill. App. 1978). But, the mere breach of an employment contract is insufficient to give rise to a claim of constructive fraud. See *Gross v. University of Chicago*, 302 N.E.2d 444, 453-54 (Ill. App. 1973) (employer/employee relationship does not create fiduciary duty on the part of the employer).

As the court has said with respect to the conversion and actual fraud claims, this case is indistinguishable from any other case in which an employer allegedly breached an employment contract. Needham offers no legal authority that would justify treating the alleged facts supporting the constructive fraud claim differently from any other breach of contract claim. The court therefore GRANTS Innerpac's motion for summary judgment on this claim.

**CONCLUSION**

Based on the foregoing, the Plaintiff's Motion for Partial Summary is DENIED. The

Defendant's Motion for Summary Judgment is GRANTED as to the conversion and fraud claims; GRANTED as to the portion of the breach of contract claim alleging non-payment of a bonus for 2003; and DENIED as to the statutory claim and the remainder of the breach of contract claim. Both Motions to Strike are DENIED as MOOT.

Entered: This 19th day of September, 2006.

s/ William C. Lee

United States District Court

Northern District of Indiana