UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| THOMAS D. NEEDHAM, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Cause No. 1:04 CV 393 |
| | ) | |
| INNERPAC, INC., | ) | |
| | ) | |
| Defendant | ) | |

### FINDINGS OF FACT AND CONCLUSION OF LAW

### I. INTRODUCTION

This is a diversity action brought by Plaintiff Thomas Needham ("Needham") asserting state law claims for unpaid wages, commissions, and bonuses under the Illinois Sales Representatives Act ("ISRA"), breach of contract, conversion and actual and constructive fraud. On September 19, 2006, the court granted summary judgment in favor of the Defendant on the conversion and fraud claims and on the portion of the ISRA wherein Needham asserted a right to bonuses. On March 6, 2007, the parties filed a joint motion to convert the jury trial to a bench trial. Subsequently, the court bifurcated the bench trial into two phases: liability and damages.

On September 12, 2007, a bench trial was held on the liability phase of the case. The parties have each submitted Proposed Findings of Fact and Conclusions of Law, and all post-trial briefing has been submitted. Having considered the arguments and the evidence submitted, the Court makes its Findings of Fact and Conclusions of Law pursuant to Fed.R.Civ.P. 52(a) and Fed.R.Civ.P. 65 based upon a preponderance of the evidence.

1

## II.  FINDINGS OF FACT[1]

Defendant, Innerpac, Inc. ("Innerpac"), manufactures and sells packaging materials including corrugated and chipboard partitions. (Stipulated Fact, ¶1).  Innerpac's headquarters is located in Cicero, Illinois, but it employs a nationwide sales force of employees who work from home offices. (*Id.* at ¶¶2-3). Innerpac sells its products to wholesale buyers who, in turn, resell the products to end users. (*Id.* at ¶4).

Needham's dealings with Innerpac began when he answered an advertisement in the newspaper wherein Innerpac was soliciting sales representatives.  (Transcript of Bench Trial, at 12, hereafter "Tr. at __"). Needham's response to this advertisement led to several preliminary meetings including a trip to Cicero, Illinois which culminated in an initial offer of employment, discussed below.  (Tr. at 10-11).

On August 8, 2000 Eugene Marino ("Marino"), then-Vice President of Sales and Marketing for Innerpac, proposed in writing, the offer of employment to Needham, hereinafter "the Initial Offer". (Tr. at 12; Pltf's Exh. 1; Dfdt's Proposed Findings of Fact, ¶12, hereafter "Dfdt's Findings).[2]  The Initial Offer proposed that Needham would become employed as a sales representative for Innerpac commencing on August 28. 2000.  The offer further proposed that Needham would be responsible for sales in Indiana and portions of Michigan and Ohio.  With respect to compensation,

---

[1]So as to comply with Fed.R.Civ.P. 52(a) the Court makes the following Findings of Fact which will be set out in narrative fashion.  Any Finding of Fact deemed to be a Conclusion of Law is hereby incorporated as such and any Conclusion of Law deemed to be a Finding of Fact is hereby incorporated as such.

[2]Pursuant to this court's standard practice, the parties submissions indicate as to each other's Proposed Findings of Fact whether certain facts were either admitted, disputed, or undisputed but irrelevant.  Although the Court has cited to Defendants' Findings, it should be noted that the Plaintiff's submissions indicate that he did not dispute these facts.

Item 3 of this proposal provided for a $55,000 salary for one year with an eventual transition to a draw-based commission program. The last paragraph of Item 3 reads as follows:

> Under the draw-based program, you are eligible to receive advanced payment commensurate with your $55,000 salary against future commissions earned. Excess commissions earned will be reconciled and paid to you in the month directly following when they are earned.

(Dfdt's Findings, ¶13). Item 4 further defines the term "commissions" as "net of freight on business based on the month of shipment" and indicates that commissions paid "will range from 3.5% to 10% based on profit margin." (Dfdt's Findings, ¶¶14-15). Profit margin is not further defined. Item 5 provides for the reimbursement for various business expenses incurred by Needham capped at $500.00 per month. (Dfdt's Findings, ¶16). Finally, the proposal contemplates Needham agreeing to execute a commitment letter limiting his activities as a real estate broker to weekends.[3] The parties agree that the Initial Offer contains no term that expressly limits Needham's receipt of commissions to the duration of his employment at Innerpac.

On August 9, 2000, Needham responded to Marino's offer letter in writing seeking confirmation of and/or changes to certain items in the initial proposal, hereinafter "the Response." (Tr. at 15; Pltf's Exh. 2). In its entirety, the response reads:

Dear Gene:

In response to your proposal for employment with Innerpac, Inc. The following list represents areas I wish confirmation as related to your offer:

1. When the mutually agreed commission structure takes effect, commissions earned and paid are to be based on current and future sales from territory.

2. Expenses associated with home office reimbursement shall include

---

[3]Needham is a licensed real estate broker.

3

> stationery, postage, copies, fax machine supplies, telephone line installation and monthly charges, cell phone, computer, printer (if required) and any usual and customary business expenses.
>
> 3. Mileage reimbursement to be thirty-one cents per mile from a radius beyond one hundred miles from my residence.
>
> 4. Health insurance to take effect at the first of the month following starting date.
>
> 5. I agree to execute a commitment letter limiting activities with respect to real estate to hours outside the "9-5" workday.
>
> 6. Paid vacation of five days earned after each six months of service while on salary structure.
>
> Thank you for this opportunity to join the Innerpac team. I look forward to a long and lucrative mutual relationship. Should you have any questions, please contact me at your convenience.

(Pltf's Exh. 2).

Needham testified that although the words "post-termination commissions" were not used in his response, he believed that this was implied by the initial offer since it did not set out a termination date for commissions or make them contingent on current employment. More importantly, however, Marino testified that he understood that Needham, by his inquiries in his August 9, 2000 letter, sought payment of post-termination commissions. (Tr. at 66, 95: "he was requesting current and future sales which, to me, meant to be paid on current sales, employed sales, and, then, future sales, beyond employment.").

Marino responded to Needham's inquiries by letter dated August 11, 2000. (Pltf's Exh. 4). In that letter, Marino amended the August 8, 2000 Offer Letter ("Final Offer") but, again, did not expressly include any term or phrase conditioning or limiting Needham's receipt of commissions to his active employment at Innerpac. (Tr. at 64.). He testified that this was because Innerpac, to

his knowledge, had never agreed to pay post-termination commissions to any salesperson.  (*Id.* at 92).  Nevertheless, according to Marino, he added language to the last paragraph of item 3 of the initial proposal which he believed responded to Needham's request for post-termination commissions.  (*Id.* at 96). The revised item 3 read:  "Commissions are based on current monthly shipments according to a contribution margin and paid net of freight charges."  (*Id.* at 67-68). Needham interpreted this response as an acceptance of his request for post-termination commissions since there was no language he perceived as making his receipt of commission contingent upon his continued employment. (Tr. at 18; Tr. at 52-53).  Needham testified:

> Q:      ...Did you consider Mr. Marino's August 11, 2000 letter and, specifically, the statement in paragraph 3 regarding commissions are based on current monthly shipments as a response to your Item number 1 in your August 9th letter?
> A.      ...I simply construed that as reiterating what we had – what I had responded to on my letter of the 9th.  Current refers to what's going on at that point in time.
> COURT:   Did you construe this sentence that's been read several times now as a rejection of your claim that you're going to be paid future commissions after your employment ends?
> A.      No.

(Tr. at 52-53).

Marino also expressly incorporated in the Final Offer Needham's request for reimbursement of business expenses, reimbursement for certain mileage expenses, the request for paid vacation, and Needham's proposal that his real estate activities be limited to outside the "9-5" workday.  (Exh. 4).

On August 15, 2000,  Needham accepted the revised item 3 along with the other terms in the August 11, 2000 offer and entered into an employment agreement ("the Agreement") with Innerpac. Needham thus, agreed to work as a company sales representative in exchange for payment from

Innerpac as set forth in the Agreement.[4]

Needham worked and accepted commissions under the Agreement from April 1, 2001[5] through July 15, 2003. During that time Needham successfully developed customer relationships with new or return customers throughout his territory generating revenue for Innerpac through the placement of orders from these customers. Included in these customer relationships were new companies which had never transacted business with Innerpac prior to Needham's involvement and former customers re-secured by Needham. Innerpac, in turn, calculated and paid Needham commission on new accounts and reopened accounts. (Stipulated Facts, ¶11).

On July 15, 2003, Innerpac notified Needham by letter of his immediate termination. (Stipulated Facts, ¶¶17-18). Innerpac has not paid any commissions to Needham since the date of his termination.

### III. CONCLUSIONS OF LAW[6]

The issue in phase one of this bench trial is whether the Agreement contemplates, as plaintiff suggests, the payment of post-termination commissions or whether the Agreement terminates

---

[4] Additional terms of employment, not relevant to the instant dispute, were later incorporated, via signed memorandum dated August 28, 2000, a date coinciding with Needham's first official workday with Innerpac. (Stipulated Facts, at ¶6).

[5] Needham was initially paid an annual salary of $55,000 but that salary increased to $65,000 on January 31, 2001. (Stipulated Facts, ¶8). On April 1, 2001, Innerpac transitioned Needham to a straight commission-based compensation system as set forth in the Agreement. Under this compensation system, Needham was to be paid a commission calculated at a rate between 3.5% and 10% of sales, net of freight charges, based upon profit margin. (*Id.* at ¶9).

[6] The parties have previously agreed (and cited in their briefs) that there is no substantial difference between Indiana or Illinois law as it applies to the contract claim. Because this district court sits in Indiana, the court refers to Indiana law as the law of the forum but occasionally references Illinois law.

commission payments at the time of termination. The question is critical to resolve because Needham argues that under the "procuring cause" rule, he is entitled to commissions on sales made after the termination of his employment since he procured the sales through his activities prior to termination. The rule applies, however, only if the contract does not expressly provide when commissions will be paid. *Technical Representatives, Inc., v. Richardson Merrell, Inc.*, 438 N.E.2d 599 (Ill. App. 1982); *Harold Wright Co., Inc. v. E.I. DuPont De Nemours & Co., Inc*. 49 F.3d 308, 309 (7th Cir.1995) (applying Indiana law). In its defense, Innerpac contends that the contract here, as demonstrated by the parties' intent, expressly provides that Needham is only entitled to commissions during the length of his employment.[7]

This court has previously held that the language in the Agreement which the Defendant drafted, to wit: "Commissions are based on current monthly shipments according to a contribution margin schedule and paid net of freight charges," is ambiguous (i.e., reasonable persons could find its terms susceptible to more than one interpretation) and thus, a trial was necessary to determine the intent of the parties at the time they entered the contract. See Docket #62 at p. 16.[8] The court turns now to an examination of the law in light of the factual findings established during the trial.

---

[7] Innerpac's position, however on this point appears to have changed throughout this case. Prior to trial, Innerpac asserted that the contract language "current monthly shipments" expressly rejected the notion that post-termination commissions were payable thereby disqualifying Needham from receiving such commissions. After trial, and in its response to Needham's post-trial brief, Innerpac concedes that the contract does not expressly state that Needham is not entitled to post-termination commissions. (Docket #127 at p. 4: "The language of the contract does not provide for Innerpac to pay post-termination commissions to Needham.") Then, in the same filing, Innerpac asserts "[t]he final expression of Needham's intent, the signed contract, conveyed that he would not receive payment for post-termination commissions." *Id.* at p. 5.

[8] If the terms of a written contract are ambiguous, it is the responsibility of the trier-of-fact to ascertain the facts necessary to construe the contract. *Pinkowski v. Calumet Twp.,* 852 N.E.2d 971, 981 (Ind.Ct.App.2006), *trans. denied.* If a contract is ambiguous, extrinsic circumstances and rules of contract construction may be employed to help construe the contract and ascertain the intent of the parties. *Id.*

7

A court's principal goal in construing a contract is to ascertain and give effect to the parties' intent at the time they entered the contract. *Indiana Port Comm'n v. Consolidated Grain and Barge Co.,* 701 N.E.2d 882, 887 (Ind.Ct.App.1998). The basic requirements for a contract are: offer, acceptance, consideration, and a meeting of the minds of the contracting parties. *Batchelor v. Batchelor,* 853 N.E.2d 162, 165 (Ind.Ct.App.2006). A "meeting of the minds" on all essential elements or terms is necessary to form a binding contract. *Ind. Dept. of Corr. v. Swanson Servs. Corp.,* 820 N.E.2d 733, 737 (Ind.Ct.App.2005).

Innerpac argues in its post-trial brief that the court should conclude that the parties never formed an enforceable contract because, based on their different views of what the contract meant, they never arrived at a meeting of the minds. In response, Needham contends that there was a meeting of the minds on all essential terms and, in particular, on the issue that Needham was to receive commission payments from Innerpac. What is ambiguous, according to Needham, is the details of those payments, i.e., when did they cease, were they payable only during employment, etc. and thus, the court should construe the ambiguous language against Innerpac, the drafting party.

Certainly, a binding mutual understanding or meeting of the minds is required to establish a contract. However, a meeting of the minds sufficient to establish a contract requires no precise formality or express utterance from the parties themselves as to all the details of the proposed agreement; it may be implied from the parties' conduct and the surrounding circumstances. Indeed, contract formation is not a matter of form but substance; there are no magic words and no magic forms essential to the creation of binding agreement. See *Pinnacle Comp. Serv. v. Ameritech Pub.,* 642 N.E.2d 1011, 1013 (Ind.Ct.App.1994)(holding that assent to the terms of a contract may be expressed by acts which manifest acceptance);17 Am.Jur.2d *Contracts* §§ 18, 19 (1964), at 354-55:

8

("The entry of the parties into a contractual relationship must be manifested by some intelligible conduct, act, or design. Assent in the sense of the law is a matter of overt acts and expressions ....").

In this case, the parties clearly had a meeting of the minds sufficient to establish a valid employment contract. Both sides intended to enter into an employment agreement and the terms, as set out in the Agreement are sufficiently definite and complete to establish a contract. More importantly, both sides operated as though they had a valid contractual arrangement throughout the length of Needham's employment and it is only now, after the employment arrangement has ended, that Innerpac contends that no contract was formed so as to excuse it from any obligations that may arise post-termination.

Further, the evidence is also clear that both parties agreed on the language in the Final Offer that "[c]ommissions are based on current monthly shipments according to a contribution margin schedule and paid net of freight charges." The problem, as the court has viewed it, is that the agreed upon language is ambiguous, as evidenced by the competing interpretations of the language by the parties. The fact that parties may have differing interpretations of a contract or even that the terms of a contract may be ambiguous does not mean that no contract was formed. See *e.g., Comdisco, Inc. v. Dun & Bradstreet Corp.*, 713 N.E.2d 698 (Ill.App.,1999)*; Klemp v. Hergott Group, Inc.,* 641 N.E.2d 957, 963 (Ill. App. 1994). Thus, the court concludes, contrary to Innerpac's contention, that a contract was formed between the parties but that a term of that contract is ambiguous.

This said, if the terms of the contract are unclear, ambiguous, or capable of more than one interpretation, the court construes them to determine and give effect to the intent of the parties at the time they entered into the contract. The court construes a contract against the drafter only if it cannot ascertain the parties' intent from all the ordinary interpretative guides and the language remains

9

ambiguous. *In re Kemper Ins. Companies*, 819 N.E.2d 485, 490 (Ind.App.,2004).

Using these guidelines, the court concludes that the parties' intent cannot be gleaned using the ordinary interpretative guides. In the court's view, the critical fact in this case, revealed at trial, was Marino's understanding of what Needham's letter of August 9, 2000 was asking and his response to it. Marino testified unequivocally that he understood that Needham's August 9, 2000 letter was seeking post-termination commissions. Marino further testified that he amended the initial offer in a way he believed was sufficient to reject Needham's request for post-termination commissions. This amendment resulted in the ambiguous language "current monthly shipments" which is the subject of the present dispute.

Given the fact that the contract was drafted by the Marino, coupled with his admission at trial that he fully understood that Needham was requesting post-termination commissions, the court concludes that it was incumbent on Marino to use language in the contract to obviate any ambiguity. It is axiomatic that when parties set down their agreement in a clear, complete document, their writing should be enforced according to its terms. Marino should have used clear language to specify the intent and meaning of the phrase "current monthly shipments." He did not. The language in the contract lends itself to a reasonable basis for a difference of opinion and interpretation. As a lay person, Plaintiff's interpretation of said language is reasonable, therefore, any ambiguity should be construed in his favor. Accordingly, the court concludes that the Agreement does not provide for the payment of post-termination commissions and thus, the "procuring cause rule" is applicable to determine whether Needham is entitled to post-termination commissions.

## **CONCLUSION**

Based upon the above conclusions of law, the Court finds in favor of the Plaintiff on the

liability phase of this bench trial and it is THEREFORE ORDERED that this cause shall proceed to phase II of the bench trial wherein the parties will try the issue of whether Plaintiff was, in fact, the procuring cause of any of the accounts or orders for which he is seeking commissions.  A telephone conference to discuss a trial date will be set by way of separate minute entry.

SO ORDERED.

This 29th day of November, 2007

>s/ William C. Lee
>United States District Court